# LAMPERT YARDS, INC., AND ANOTHER v. THOMPSON-WETTERLING CONSTRUCTION & REALTY, INC., AND OTHERS. NORTHWESTERN NATIONAL BANK OF MANKATO, APPELLANT.

223 N. W. 2d 418.

November 8, 1974—No. 43935.

*Blethen, Ogle, Gage & Krause, Bailey W. Blethen, Randall C. Berkland,* and *David T. Peterson,* for appellant.

*Fredrikson, Byron, Colborn, Bisbee, Hansen & Perlman* and *James L. Baillie,* for respondent M. L. Gordon Sash & Door Co.

*McLean, Peterson & Sullivan* and *Thomas R. Sullivan,* for respondent plaintiff.

*Jerome V. Blatz* and *Gary A. Flaten,* for respondent Suburban Industries, Inc.

*Johnson, Schmidt, Thompson, Lindstrom & Thompson* and *Henry W. Schmidt,* for respondent Minnesota Electric Supply Co.

*Dailey & Kunard* and *James J. Dailey,* for respondent Mankato Plumbing & Heating.

*Simmonds & Bradshaw* and *John E. Simmonds,* for respondents The Sherwin-Williams Co. and others.

*Frank Hammond, Ronald E. Orchard, John R. Kenefick* and *Briggs & Morgan,* for Minnesota Bankers Association, amicus curiae.

Heard before Knutson, C. J., and Otis, Peterson, and Mulally, JJ., and considered and decided by the court en banc.

PETERSON, JUSTICE.

This is an appeal from the judgment of the district court and a request for review of that judgment. The trial court awarded priority to the mortgage of plaintiff Northwestern National

Bank of Mankato on a bankrupt apartment project, over various mechanics liens, according to the provisions of Minn. St. 1971, § 514.05.[1] However, the trial court made certain deductions from the amount of the statutory priority and also failed to order foreclosure of liens against the bankrupt project which had been assigned to Northwestern. Northwestern's appeal arises out of these latter actions. Respondents are mechanics lienholders who seek reversal of the trial court's judgment granting statutory priority to Northwestern.

On October 2, 1969, Thompson-Wetterling Construction & Realty, Inc., executed a note and mortgage in the amount of $119,000 in favor of Northwestern, to secure a loan for the construction of an apartment building on real estate owned by the construction company. On the same day, a building permit issued for construction and two of the respondents at the request of Thompson-Wetterling spent several hours on the property outlining the building on the lot. These respondents drove new stakes in the ground at the four corners of the proposed building. Batter boards consisting of 2 x 4's were nailed to the stakes horizontally, and test string was run around the perimeter of the proposed building and nailed to the batter boards. The elevation of the batter boards and the string was approximately 1 ½

---

[1] Minn. St. 1971, § 514.05 provides: "All such liens, as against the owner of the land, shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had actual notice thereof. As against a bona fide purchaser, mortgagee, or encumbrancer without notice, no lien shall attach prior to the actual and visible beginning of the improvement on the ground, but a person having a contract for the furnishing of labor, skill, material, or machinery for such improvement, may file for record with the register of deeds of the county within which the premises are situated, or, if claimed under section 514.04, with the secretary of state, a brief statement of the nature of such contract, which statement shall be notice of his lien for the contract price or value of all contributions to such improvement thereafter made by him or at his instance."

feet off the ground. The site of the proposed building was set back 50 feet from the front of the lot. The batter board construction could not be seen from the edge of the field because the lot was covered with weeds about 3 feet high.

On October 3, 1969, the mortgage was recorded. Excavation of the site for sewer and water began 3 days later. The total mortgage money of $119,000 was disbursed in three payments between October 23, 1969, and February 5, 1970. At no time during the disbursements did Thompson-Wetterling possess lien waivers from its laborers and materialmen in the amount of even 50 percent of the total mortgage money which it received. The trial court found that Northwestern was negligent in its authorization and supervision of the loan, violating its own customary standards for construction lending.

On May 11, 1970, Thompson-Wetterling filed a petition in bankruptcy. Lien statements were filed by various subcontractors and materialmen between May 8, 1970, and June 11, 1970. On July 2, 1970, plaintiff Lampert Yards, Inc., one of the lien claimants, commenced an action to foreclose its lien. On July 27, 1970, Northwestern commenced its mortgage foreclosure action. The two actions were consolidated for trial.

Before trial, Northwestern made two factually relevant purchases. On July 20, 1970, the bank purchased the bankruptcy trustee's interest in the property for $2,500. The bank went into possession of the building, invested additional money to complete the construction, and rented it, obtaining rental income of approximately $10,000 by the date of trial. The bank also purchased, for "good and valuable consideration," six of the smaller mechanics liens, the face value of which aggregated $9,911.17.

The trial court determined that Northwestern's mortgage had priority over the lienholders because the mortgage was executed and recorded before the "actual and visible beginning of the improvement" within the meaning of Minn. St. 1971, § 514.05. However, the trial court also determined that the carelessness of the bank in managing the loan approval and disbursements

created an equitable estoppel. Consequently, the trial court reduced the amount of the bank's priority to only that amount for which Thompson-Wetterling had received lien waivers, evidently on the theory that mortgage disbursements not made against lien waivers were negligently paid. The court further reduced the priority of Northwestern by the amount of rent which it had received from the completed building following its purchase of the bankruptcy trustee's interest in the project, ruling that such rent monies should have been applied by Northwestern against the mortgage debt.

For reasons not made clear in its memorandum opinion, the court failed to order foreclosure of the mechanics liens assigned to Northwestern.

1. Respondents seek review of the district court's conclusion that Northwestern was entitled to statutory priority. Minn. St. 1971, § 514.05, allows mortgage lienholders priority over mechanics lien claimants whenever the mortgage is executed and recorded "prior to the actual and visible beginning of the improvement on the ground." The trial court determined that such actual and visible beginning commenced on October 6, 1969, 3 days after the mortgage had been recorded. The court relied upon the authority of Reuben E. Johnson Co. v. Phelps, 279 Minn. 107, 156 N. W. 2d 247 (1968), in concluding that the batter board construction in place before the recording of the mortgage was not an actual and visible beginning within the meaning of the statute.

In Phelps, we held that the presence of a few grade or fill stakes not readily visible to observers who walked the field in question did not constitute such actual and visible notice as required by § 514.05. We said (279 Minn. 112, 156 N. W. 2d 251):

"* * * In order to have priority over a mortgage duly recorded, the material or labor furnished for the improvement must represent an actual beginning of the improvement *on the ground* and it must be visible; that is, a person using reasonable diligence in examining the premises must be able to see it."

Respondents argue that, by implication from the facts of Phelps, the rule of law should be that reasonable diligence is required in physically examining the property and that notice is given to potential mortgagors if the beginnings of construction are observable by actually walking on the property. Since anyone inspecting the property by walking on it would have encountered the strings, and eventually the batter board construction, respondents argue that the legal conclusion of the district court that the beginning of construction was not visible must be reversed and that they should be awarded priority over the mortgage.

We do not agree. The legislative intent behind the statute would not be served by a rule of law which established statutory notice whenever such slight structures as then existed could be discovered only by tramping the fields of an intended construction site. Several of the lienors admitted that the batter board structure was not visible from the edge of the field. The terrain was flat, and the edge of the field constituted a reasonable position from which to make inspection. The statute is intended to provide fair notice to mortgagees of improvements "on the ground." Wentworth v. Tubbs, 53 Minn. 388, 55 N. W. 543 (1893). We hold, in agreement with the trial court, that such notice is not given where nothing can be seen of the construction from the edge of the field.

2. Respondents additionally urge review of Northwestern's priority on the ground that Northwestern was no longer the mortgagee of the property at the time of trial. Respondents contend that Northwestern's purchase of the interest of the trustee in bankruptcy merged the legal and equitable titles, extinguishing Northwestern's interest as mortgagee and, with it, the underlying obligation of the mortgage which Northwestern sought to enforce in the bankruptcy proceedings.

An essential prerequisite of merger is that the party having both the legal and equitable interests have the intention that the interests should merge. Geissinger v. Robins, 274 Minn. 215, 143 N. W. 2d 50 (1966); Losleben v. Losleben, 199 Minn. 227, 271

N. W. 463 (1937) ; see, also, 55 Am. Jur. 2d, Mortgages, § 1258. There is nothing in the record to suggest such intention, and the trial court found no such intention. Since the question is one of fact and since the trial court's determination was in no respect clearly erroneous, respondents' argument must fail. In re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972).

3. Northwestern challenges the various deductions which the trial court made from the amount of its statutory priority over the lien claims of respondents. The trial court first reduced Northwestern's priority by the amount of the mortgage disbursements in excess of the amount for which Thompson-Wetterling had lien waivers from the subcontractors. The court appeared to reason that disbursement in excess of the amount of lien waivers was carelessness by Northwestern, which violated some legal duty to the lienholders. It is difficult to determine, however, in what the responsibility of Northwestern to the lienholders consists.

Nothing in the evidence suggests a contractual relationship which would oblige the bank to protect the interests of the subcontractors. Neither does the record contain evidence sufficient to demonstrate the fundamental elements of an equitable estoppel which would operate to prevent the bank from claiming its priority. The trial court cited Nehring v. Bast, 258 Minn. 193, 103 N. W. 2d 368 (1960), for the principle that whenever one of two innocent persons must suffer by the acts of a third, he who by his conduct, act, or omission has allowed such third person to occasion the loss must sustain it. This principle has been applied in cases where the third person who caused the loss, as in this case Thompson-Wetterling, had in some sense or to some extent been the agent of the party who is made to sustain the loss, which in this case would be the bank. See, also, Morrison v. Swenson, 274 Minn. 127, 142 N. W. 2d 640 (1966) ; Kausal v. Minnesota Farmers' Mutual Fire Ins. Assn. 31 Minn. 17, 16 N. W. 430 (1883) ; Pesina v. Juarez, 288 Minn. 379, 181 N. W. 2d 109 (1970). This principle of law has no application where,

as here, there is no evidence that the bank made any effort to induce respondents to believe that Thompson-Wetterling was its agent, nor that Thompson-Wetterling did so. There is no evidence that respondents relied on the existence of such a relationship in making advances to Thompson-Wetterling. In the absence of inducement and reliance, no estoppel is created. The mere existence of harm if the estoppel is not allowed is not sufficient to create the estoppel.

There can be no cause of action in tort independent of the doctrine of estoppel. In Connor v. Conejo Valley Development Co. 61 Cal. Rptr. 333 (1967), and in Connor v. Great Western Savings & Loan Assn. 69 Cal. 2d 850, 73 Cal. Rptr. 369, 447 P. 2d 609 (1968), the lender of a construction loan was held under a duty to prospective purchasers and potentially liable with the developer for substantial structural defects of homes built on shifting-clay terrain. The duty was imparted from a public policy to protect low-income home purchasers from gross structural hazards, even though there was no evidence that the purchasers had directly relied on the agency which financed the project. Absent a showing of bad faith, we perceive no comparable duty or public policy in the case at bar, for the mechanics lienholders were as able to protect themselves from the insolvency of the construction company as was Northwestern. As the court stated in First Nat. State Bank of New Jersey v. Carlyle House, Inc. 102 N. J. Super. 300, 317, 246 A. 2d 22, 31 (1968):

"* * * [T]he ordinary subcontractor who contemplates contracting with an undercapitalized developer has a number of checking procedures customarily available to him. Generally, he can inquire of other contractors about their experience with the developer, consult trade association lists of unreliable borrowers with past records of defalcation, obtain financial reports on the principals * * *. Therefore, he is far better prepared to assess his risks of dealing with the undercapitalized developer than the homeowner in Connor v. Conejo Valley Development Co., *supra*."

See generally, Lefcoe and Schaffer, *Construction Lending and the Equitable Lien*, 40 So. Cal. L. Rev. 439.

4. The trial court further reduced Northwestern's priority by the amount of money it had collected from the rentals of the completed apartment building. Respondents argued that the application of the rents to the mortgage debt was required to prevent waste and, further, that a mortgagee in possession is accountable for profits. Although the trial court held that there was no merger of the legal and equitable estates as a consequence of Northwestern's purchase of the interest of the trustee in bankruptcy, it nevertheless agreed that Northwestern was bound to apply those revenues toward retirement of the mortgage debt.

We have held, however, that the mortgagor in possession need not apply rents toward the mortgage debt because nonpayment of the mortgage is not "waste" and because rents and profits are not part of the security of a real estate mortgage. John Hancock Mutual Life Ins. Co. v. Meester, 173 Minn. 18, 20, 216 N. W. 329, 330 (1927). Nor does the presence of secondary encumbrances represented by the mechanics liens produce a different result. The security of the mechanics liens is not based upon rents or profits and the mortgagor in possession is thus not obliged to hold such revenues for the protection of the mechanics lienholders. Minn. St. 514.01; King v. Smith, 42 Minn. 286, 44 N. W. 65 (1890); 12 Dunnell, Dig. (3 ed.) § 6040.

Moreover, while it is true that a mortgagee in possession is ordinarily required to account for the rents and profits he received and either apply them to the mortgage or hold them for the mortgagor, Cargil v. Thompson, 57 Minn. 534, 59 N. W. 638 (1894), this rule has no application here. The bank's independent right to the revenues from the properties derives from its status as mortgagor in possession. Grady v. First State Security Co. 179 Minn. 571, 229 N. W. 874 (1930). The revenues are the fruit of the bank's purchase of the trustee's interest in bankruptcy of which it may not be deprived by the fact that it also is mortgagee of the project. Absent merger, the bank held separate legal

statuses, that of mortgagor in possession and mortgagee in possession. Respondents' argument impermissibly would confuse the obligations of one status with the rights of the other.

Finally, the trial court, for reasons not stated, refused to allow Northwestern to foreclose various liens assigned to it by labor and materialmen who had worked on the project. Such claims are specifically assignable. Minn. St. 514.73; Tuttle v. Howe, 14 Minn. 113 (145) (1869). We have frequently held that the assignment of a debt carries with it all the securities and remedies which the assignor held or might have employed to enforce its payment. Kinney v. Duluth Ore Co. 58 Minn. 455, 60 N. W. 23 (1894); see, also, W. T. Bailey Lbr. Co. Inc. v. Eveleth Elks Bldg. Corp. 167 Minn. 5, 208 N. W. 198 (1926). Respondents argue that the purchase of the underlying debts at discount should preclude foreclosure of the liens, nothing in the record establishes that they were in fact purchased at discount; and, in any event, no reason is advanced why the assignments should for such reason be rendered unenforceable.

The judgment insofar as it grants plaintiff Northwestern National Bank of Mankato priority over the lien claimants is affirmed, but so much of the judgment constituting deductions from the amount of that priority is reversed. We remand with directions to so amend the judgment to foreclose the liens assigned to Northwestern.

Affirmed in part, reversed in part, and remanded with directions.

MR. CHIEF JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

MR. JUSTICE OTIS, following oral argument took no part in the consideration or decision of this case.